UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ x

DUNEL CADELY and JAMES HINES,

                                                      Plaintiffs,

                    -against-                                          04 CV 8196(FM)

CITY OF NEW YORK; NEW YORK CITY
DEPARTMENT OF TRANSPORTATION, ANN
WILLIAMS, ANTHONY NAPOLITANO, MICHAEL          **REPLY DECLARATION OF**
CUMMISKEY,                                     **PHYLLIS CALISTRO IN**
                                               **SUPPORT OF**
                                    Defendants. **DEFENDANTS' MOTION**
                                               **TO DISMISS JAMES HINES'**
------------------------------------------------------------------------ x **CLAIM UNDER THE**
                                               **AMERICANS WITH**
                                               **DISABILITIES ACT**


PHYLLIS CALISTRO declares, pursuant to 28 U.S.C. § 1746 and under penalty of perjury, that

the following is true and correct:

      1.    I am a Senior Counsel in the office of MICHAEL A. CARDOZO,

Corporation Counsel of the City of New York, attorney for Defendants.  I am an attorney

admitted to practice before this Court.

      2.    I am fully familiar with the facts and circumstances in this action, and

submit this Reply Declaration in support of Defendants' Motion to Dismiss plaintiff Hines'

claim under the Americans with Disabilities Act, pursuant to Federal Civil Procedure Rule 56

and Local Civil Rule 56.1.

      3.    Attached hereto as Exhibit "A" are true and accurate excerpts from the

deposition testimony of Ann Williams and Sawat Losoponkol, M.D. dated October 5, 2007 and

September 24, 2007, respectively.

4.    Attached hereto is Exhibit "B" is a true and accurate copy of a Verified Complaint by James Hines against the New York City Department of Transportation ("DOT") which was submitted to the New York City Commission of Human Rights on December 18, 2000.

5.    Attached hereto as Exhibit "C" are true and accurate copies of correspondence regarding non-strenuous employment opportunities with the DOT sent to counsel for James Hines, copied to James Hines, dated May 11, 2007 and a facsimile transmission declining to accept such a position, dated October 19, 2007.

6.    Attached hereto as exhibit "D" is a true and accurate copy of the sworn testimony of Arnold Berlin, M.D. at a proceeding before the City of New York Office of Administrative Trials and Hearings, dated December 19, 2006.

7.    Attached hereto as exhibit "E" are true and accurate copies of a sampling of complaints written by various DOT employees, regarding James Hines' conduct.


Dated:        New York, New York
              December 26, 2007

                              PHYLLIS CALISTRO (PC5527)
                              Senior Counsel

# EXHIBIT A

1                                                    1

2    UNITED STATES DISTRICT COURT
     FOR THE EASTERN DISTRICT OF NEW YORK

3    ---------------------------------------X
     DUNEL GADELY and JAMES HINES,

4
                              Plaintiffs,

5

6        -against-

7    NEW YORK CITY DEPARTMENT OF
     TRANSPORTATION, ANN WILLIAMS, ANTHONY

8    NAPOLITANO, MICHAEL CUMMISKY, LOCAL 376
     of DISTRICT COUNCIL 37 of THE AMERICAN

9    FEDERATION OF STATE, COUNTY AND MUNICIPAL
     EMPLOYEES, GENE DEMARTINO and THOMAS

10   KATTOU,

11                             Defendants.
     ---------------------------------------X

12               100 Church Street
                 New York, New York

13
                 DATE:  October 5, 2007

14               TIME:  10:20 a.m.

15

16        EXAMINATION BEFORE TRIAL of the

17   Defendant, ANN WILLIAMS, taken by the

18   Plaintiff pursuant to the Federal Rules

19   of Civil Procedure and Notice, held at

20   the above-mentioned time and place before

21   Karen D. Williams a Notary Public of the

22   State of New York.

23

24

25

108

anything should happen, we are relieved
of that responsibility.

Q    Miss Williams, I have already
marked and shown you several notes on
prescription pads from Dr. Loo, that
Mr. Hines can return to work and perform
all seven tasks, which is what you are
saying you want from him, you have that
already, what else, if anything, do you
want?

A    I am sorry, Mr. Spirn, I beg to
differ.  Yes, we have confirmation that
he can perform seven tasks, but it's not
Dr. Loo's signature.  He sent me his
signature, and his secretary or his
medical assistant has clearly spoken to
me, personally informing me that he will
not sign it, he will not approve
Mr. Hines going back to work.  I need
Dr. Loo to say to me, Yes, I will do so.
Those medical documentation's apparently,
according to the medical assistant, they
are not his.

Q    I am going to show you Exhibit

129

```
 1
 2          deposition.
 3                  MS. CALISTRO:  I disagree.
 4          She is a witness, she is a
 5          defendant, you brought her into
 6          this deposition, so --
 7                  MR. SPIRN:  You can question
 8          her about any aspect of the
 9          deposition that's been held.  You
10          are getting into areas that have
11          nothing to do with the deposition.
12                  MS. CALISTRO:  I think she
13          is leading up to.
14      Q       Was there a conversation about
15  James Hines with Dunel Cadely?
16      A       Yes, it was.
17      Q       What did Dunel Cadely say about
18  James Hines?
19      A       He basically said that
20  Mr. Hines could not perform the work.  He
21  had to help him many times on the job.
22      Q       You were asked at the beginning
23  of the deposition about the condition
24  whether you believed Mr. Hines suffered
25  from -- I guess my question is, did you
```

1                                             130

2      have a belief as to whether or not he

3      actually suffered from any condition or

4      were you just accepting medical notes

5      saying he had a condition?

6          A      Exactly.  I just accepted the

7      notes.  I believe he had a condition.  It

8      was not my choice to believe or didn't

9      believe, but I honestly accepted it for

10     what it was.

11         Q      That was with respect to

12     Exhibit 1?

13         A      Initially.

14         Q      I am going to show you Exhibit

15     1 again.  This was back with respect to

16     the October 18, 2005 letter from

17     Losoponkul's office?

18         A      Right.

19         Q      Did you accept that and believe

20     that at the time when you received that

21     in October '05?

22         A      Exactly, I did.  And it was at

23     this point I basically requested, I was

24     looking into accommodations for him and

25     requesting functions without

COPY

1   UNITED STATES DISTRICT COURT

2   SOUTHERN DISTRICT OF NEW YORK

    ------------------------------------------------------------X

3

    DUNEL CADELY and JAMES HINES,

4

                         Plaintiffs,

5

        -against-

6

    NEW YORK CITY DEPARTMENT OF TRANSPORTATION, ANN WILLIAMS,

7   ANTHONY NAPOLITANO, MICHAEL CUMMISKEY,

8                        Defendants.

9   ------------------------------------------------------------X

10

11                       100 Church Street
                         New York, New York

12

13                       September 24, 2007
                         12:45 p.m.

14

15

16      DEPOSITION of DR. SAWAT LOSOPONKOL, a Non-Party Witness

17   here, pursuant to Subpoena, held at the above-mentioned

18   time and place, before a Notary Public of the State of New

19   York.

20

21

22

23

24

25

44

- Losoponokol -

1           Do you have any understanding of what that

2   means exactly?

3       A    No.

4           MR. PARERES: I don't either.  Unless

5           it's from a psychological point of view.

6       Q    Your testimony is that you can't really say

7   whether he can perform this task?

8       A    To me, I think, again, he can perform up to a

9   certain degree.

10      Q    But it's difficult just for you to pinpoint what

11  that degree is?

12      A    Right.

13      Q    I'm going to show you now what has been marked as

14  Exhibit D, which is dated June 8, 2007 (handing).

15           Is that your signature appearing on this

16  document?

17      A    No.

18      Q    Whose signature is that?

19      A    That's Ms. Dawes.

20      Q    Who is she?

21      A    She's my medical assistant.

22      Q    As your medical assistant, does she have authority

23  to write notes for people, such as the note reflected in

24  this exhibit?

25      A    Yes.  Usually I told them.  When they write a

- Losoponokol -

1   note, I told them what to write.

2       Q    Looking at this exhibit, this is not your

3   handwriting, correct?

4       A    Right.

5       Q    Do you have any recollection of having told

6   Ms. Dawes to write this note?

7       A    I don't believe so, but usually they won't write

8   without informing me.

9       Q    So, your standard practice would be she would tell

10  you what she was going to write and you would approve it?

11      A    No.  I told her what to write and she would write

12  it and most time I look at it and sign it, but I don't know

13  why this time I didn't sign.  Usually, I sign.

14      Q    Your name in the form of a stamp does appear on

15  this document, correct?

16      A    Yes.  Usually, I sign.  I don't know what reason

17  why I did not sign.  I'm supposed to sign every note.

18      Q    Do you know who stamped your name on it?

19      A    I don't know.

20      Q    This note indicates that as of June 8th, that Mr.

21  Hines could return to work and he was able to perform all

22  seven job assignments, correct?

23      A    Correct.

24      Q    Those seven job assignments are as reflected in

25  the same tasks and standards that we just discussed,

**EXHIBIT B**

NYC COMM. ON H.R.        Fax:212-306-7414        Aug 16 '02   13:48   P.01

(

CITY OF NEW YORK
COMMISSION ON HUMAN RIGHTS

Complaint No:
M-E-DLR-1-1009958-D

+---------------------------------------------------+
| In the Matter of the Complaint of                 |
|                                                   |
| JAMES HINES,                                       |
|                                                   |
|                              Complainant,          |  Verified Complaint
|                                                   |  Federal Charge No
|              - against -                           |     16FA10111
|                                                   |
| NEW YORK CITY DEPARTMENT OF TRANSPORTATION,        |
| ERWIN COHEN,                                       |
|                                                   |
|                              Respondents          |
+---------------------------------------------------+

James Hines, complaining of respondent(s), alleges as follows:

1. Complainant James Hines is suffers from a heart condition and has a slipped disc in his back. His address is 438 Beach 40 Street, Apt.5A, Queens, NY 11691.

2. Respondent New York City Department of Transportation ("DOT")is an employer as defined by Section 8-102 of the Administrative Code of the City of New York. Its address is Ann Williams, Assistant Director of EEO, 40 Worth Street, 8th Floor, New York, NY 10013.

3. Respondent Erwin Cohen is employed by respondent DOT as Director of Operations. His address is c/o NYC Department of Transportation, 2 Rector Street, 4th Floor, New York, NY 10006.

4. In or around 1993 respondent DOT hired Complainant as a seasonal Assistant Highway Repairer. Complainant was assigned to Harper Street Yard.

5. In 1996 Complainant had heart surgery.

6. In or around 1997 Complainant became a permanent worker and was assigned to Kingsland Yard where in order to accommodate his heart condition, work was less strenuous.

7. On or about January 5, 2000, Complainant injured his back on the job and was granted sick leave until April 15, 2000.

8. On or about April 15, 2000, when Complainant returned to work, respondent Cohen transfered him from Kingsland Yard to Polaski Yard where the work is more strenuous.

9. Complainant charges that respondents have discriminated against him by denying him a reasonable accommodation of his disability, in violation of Sections 8-107.1(a) and 8-107.15 of the Administrative Code of the City of New York and have damaged him thereby.

10. Complainant also charges that the respondents have violated Title I of the Americans with Disability Act, 42 U.S.C. 12010 et seq. on the basis of his disability, and hereby authorizes the New York City Commission on Human Rights to accept this verified complaint on behalf of the Equal Employment Opportunity Commission, subject to the statutory limitations contained in the Americans with Disabilities Act.

CITY OF NEW YORK )

James Hines, being duly sworn, deposes and says: that I am the complainant herein; I have read (or had read to me) the foregoing complaint and know the content thereof; that the same is true of my own knowledge except as to the matters therein stated on information and belief; and that as to those matters, I believe the same to be true.

(Signature of Complainant)

Subscribed and sworn to before me
this 18th day of December, 2000

(Signature of Notary Public)

SUSAN SLOVAK - STERN
Notary Public, State of New York
No. 24-4836676
Qualified in Kings County
Commission Expires March 20, 19___

Nov 13, 2001

**EXHIBIT C**

**New York City**
**Department of Transportation**

40 Worth Street
New York, N.Y. 10013
Tel: 212/676-0868
Fax: 212/442-7007

Janette Sadik-Khan, Commissioner

Web: www.nyc.gov/dot

May 11, 2007

Leonard D. Polletta, Esq.
Assistant General Counsel
District Council 37
125 Barclay Street
New York, N.Y. 10027-2179

Re: <u>James Hines - Reassignment</u>

Dear Mr. Polletta:

In response to your letter dated May 3, 2007, we are prepared to grant Mr. Hines a position in another title.

The function of asphalt cementing joints and hardware is a seasonal function which involves sweeping gravel and lifting and pouring hot asphalt into potholes. The Yardman job which you have proposed also involves very strenuous work including sweeping functions.

Mr. Hines has requested a reasonable accommodation which we have repeatedly attempted to provide him -- to the point of eliminating some of his essential job functions which is well beyond what this agency is required to do under the ADA. Nonetheless, Mr. Hines continues to maintain that he is incapable of performing virtually any of the essential functions of the HR position which is by definition, a physically strenuous job. An accommodation as defined under the ADA is one that provides the individual an opportunity to perform the essential functions of the job with, or without that accommodation.

In your letter, you have identified Mr. Hines' syncope episode as being prohibitive in his performance of sweeping and pothole assignments. You have also stated that according to his doctor's notes "he should not be doing strenuous pothole work." We accept this recommendation and as a result, are removing all strenuous assignments from Mr. Hines' tasks. However, this necessitates our reassigning him to another job title. Hence the reason for requesting a copy of his resume, for which we are still waiting -- to place him in a non-labor intensive assignment.

Pg. 1 of 2



**AW112**

......(cont'd)......                                    Pg. 2 of 2


        We expect a response to this request as soon as possible and if you have any questions, please do not hesitate to contact us at 212/442-7760.

                              Sincerely,

                              Ann Williams
                              Assistant Commissioner/EEO Officer


c:  James Hines
    Gene DeMartino/President
    Phyllis Calistro, Esq.
    Michelle Fredericks, Esq.


                                                        **AW113**

*Korn & Spirn*

*Attorneys and Counsellors-at-Law*

*50 Clinton Street, Suite 503*

*Hempstead, New York 11550*

*516 538-5222   516 292-3556 (Fax)*

*Jay H. Korn*
*Arthur L. Spirn*

*Sidney S. Korn*
*(1909-1985)*

### FAX TRANSMISSION

**TO:**      Phyllis Calistro, Esq.. (212) 788-8877

**FROM:**   Arthur L. Spirn, Esq.

**DATE:**   October 19, 2007

**RE:**      James Hines

Dear Phyllis:

Ann Williams has written to James Hines under cover of October 12, 2007 in which she presents a position as a Clerical Associate III for Mr. Hines "based on your clerical skills presented in your resume." The position pays $32,623., less than half of what Mr. Hines earns as a highway repairer.

Mr. Hines considers this offer an insult and will await the trial of this action to pursue his rights and remedies not only to a monetary award, but for reinstatement to his position.

Very truly yours,

ARTHUR L. SPIRN

ALS:cc

**EXHIBIT D**

THE CITY OF NEW YORK
OFFICE OF ADMINISTRATIVE
TRIALS AND HEARINGS

P R E S E N T:          TYNIA RICHARD
                        Administrative Law Judge

In the matter of:

    DEPARTMENT OF TRANSPORTATION,

                            Petitioner,

        - against -                        Index No.
                                           07 0790

    JAMES HINES,

                Respondent.

                    December 19, 2006

                    Office of Administrative Trials and Hearings
                    40 Rector Street
                    New York, New York 10006

**AW022**

DIAZ DATA SERVICES
331 Schuylkill St., Harrisburg, PA 17110 - (717)233-6664

1       DR. BERLIN: So affirm.

2       ALJ RICHARD: Thank you, please be seated.  Please state

3   your name for the record.

4       DR. BERLIN: Arnold Berlin.

5       ALJ RICHARD: And how do you spell your last name?

6       DR. BERLIN: B-e-r-l-i-n.

7       ALJ RICHARD: Okay.  Thank you.  Ms. Cain.

8       Whereupon, A R N O L D   B E R L I N, a witness herein,

9   after having been duly sworn by the Court, was questioned

10  and testified as follows?

11  DIRECT EXAMINATION OF DR. BERLIN BY MS. CAIN:

12      Q.  Mr. Berlin, what is your occupation.

13      A.  Dr. Berlin.

14      MR. BROWN: I'm sorry.

15      ALJ RICHARD: Please can you speak louder?

16      DR. BERLIN: Dr. Berlin, yeah, I'm a physician.

17      ALJ RICHARD: Okay.  Thank you.

18      MS. CAIN: Your Honor, at this time, I would like to

19  have Dr. Berlin's curriculum vitae marked for

20  identification.

21      ALJ RICHARD: Sure.

22      MR. BROWN: Thank you.  Okay.  Petitioner's 2 is marked

23  for identification.

24      [Petitioner's Exhibit 2 marked for identification.]

25  BY MS. CAIN:

26      Q.  Dr. Berlin, what is your specialty?

27      A.  Internal medicine and occupational medicine.

28      Q.  Okay.  And what is the difference between

29  occupational medicine and internal medicine?

30      A.  Internal medicine is the diagnosis and treatment of

31  adult patients.  Occupational medicine is the treatment of

32  injuries or illnesses sustained in the workplace.

33      Q.  And how long have you practiced medicine?

34      A.  Since 1978, approximately 27 years.

35      Q.  Okay.  Are you currently in practice?

1    A.   Yes, I am.

2    Q.   Okay.  And where is your office located?

3    A.   264 First Street in Brooklyn, Park Slope Section.

4    Q.   Please describe your educational background?

5    MR. BROWN: I'm willing to accept this into evidence,

6    Your Honor, the curriculum vitae.

7    ALJ RICHARD: The CV, okay, I'll mark Petitioner's 2 in

8    evidence.

9    **[Petitioner's Exhibit 2 received in evidence.]**

10   BY MS. CAIN:

11   Q.   Okay.  Dr. Berlin, do you know the Respondent,

12   James Hines?

13   A.   Yes, I do.

14   Q.   In what capacity?

15   A.   I was asked to examine him regarding duty status

16   determination for the Department of Transportation of New

17   York City.

18   Q.   At this time, Your Honor, I would like to mark the

19   Dr. Berlin's independent medical examination report for

20   identification.

21   ALJ RICHARD: Yes.  Okay.  Petitioner's 3 is marked for

22   identification.

23   MS. CAIN: Okay.

24   **[Petitioner's Exhibit 3 received in evidence.]**

25   BY MS. CAIN:

26   Q.   Dr. Berlin, please identify the document I just

27   handed you.

28   A.   This is a summary of the exam that I did on

29   Mr. Hines on the date of the visit, October 13, 2006.  The

30   summary may have been written the next day, but certainly

31   within 24 hours.

32   Q.   Okay.  And who prepared this document?

33   A.   I did.

34   Q.   Okay.  And what date appears on the document?

35   A.   October the 13th.

**AW040**

BERLIN - DIRECT                                              20

1      Q.  And what is the purpose of this document?

2      A.  The purpose is to determine the functional capacity

3  as far as tasks that can be performed in the workplace by

4  Mr. Hines.

5      Q.  And was this document prepared in the ordinary

6  course of business?

7      A.  Yes.

8      MS. CAIN: At this time, I'd like to admit the

9  Independent Medical Examination into evidence, I'd like to

10  ask that it be admitted.

11     MR. BROWN: Sure, you know, Respondent, again, is

12  trouble by its date, October 13, given that the charges pre-

13  date it.  Otherwise, you know, we have no objection to it

14  going in the record.

15     ALJ RICHARD: Okay.  Petitioner's 3 is entered in

16  evidence.

17     MS. CAIN: Okay.

18     **[Petitioner's Exhibit 3 received in evidence.]**

19  BY MS. CAIN:

20     Q.  Dr. Berlin, when did you examine the Respondent,

21  James Hines?

22     A.  On the date noted on this document.

23     Q.  Okay.  And what was the basis for the Respondent

24  undergoing a Section 72 physical examination?

25     A.  I'm not sure I understand what you mean by Section

26  72 physical exam.  He was sent to me for a duty

27  determination, is that...

28     Q.  Yes, it's relatively the same thing, what was the

29  basis for him...

30     ALJ RICHARD: Okay.  Please, don't give information to

31  the witness, just ask questions, that's fine.  That's fine.

32  BY MS. CAIN:

33     Q.  What was...

34     A.  He was sent to me because there was some question

35  about his ability to perform certain task and there was one

**AW041**

1  or two instances of him not agreeing to perform certain
2  tasks.
3       Q.   Okay.   And based upon your examination of the
4  Respondent, what were your findings?
5       A.   My findings were such that his functional capacity,
6  his cardiovascular and pulmonary response to exercise were
7  predicted to be normal for age.
8       Q.   Okay.   Dr. Berlin, at this time, I'd like you to
9  refer to the independent medical examination report,
10 specifically to paragraph 2, could you please read the
11 paragraph?
12      A.   The present exam was requested due to this employee
13 allegedly refusing to perform certain task not excluded by
14 the reasonable accommodation exclusion.   The employer
15 relates this was due to a misunderstanding and he is
16 currently available to perform his job.
17      Q.   Okay.   And to the best of your knowledge, what was
18 -- what misunderstanding was the Respondent referring to?
19      A.   I'm not aware of the nature of the
20 misunderstanding.   I'm aware of an exclusion, a reasonable
21 accommodation exclusion, I don't know what the task or the
22 misunderstanding were.
23      Q.   What was the basis for your opinion?
24      A.   The basis was my physical exam and his response to
25 stimuli in the office.   Just mounting the exam table, his
26 blood pressure and pulse response to some minimal exercise,
27 which were normal.
28      Q.   And did the Respondent indicate to you that he had
29 a reasonable accommodation?
30      A.   Yes, he did.
31      Q.   And did you review the reasonable accommodation?
32 Was it in writing?
33      A.   I did not see a document that documented the exact
34 nature of the reasonable accommodation.   He did tell me that
35 he was excluded from using a jackhammer.

**AW042**

BERLIN - CROSS

1  Q. Okay. And is the Respondent physically fit to
2  perform his duties as a highway repairer?
3  A. Exclusive of the jack hammering task, yes.
4  Q. Okay. And does the reasonable accommodation that
5  the Respondent granted prohibit him from performing his
6  current duties?
7  A. No, it does not.
8  MR. BROWN: I'm going to object on the grounds of
9  relevance. There was a reference to perform his current
10 duties, Your Honor, I don't know what the relevance of that
11 is.
12 ALJ RICHARD: Well, I actually don't know what you mean
13 by current duties.
14 MR. CAIN: Well, his duties as a highway repairer, I
15 should say.
16 ALJ RICHARD: I think you should be specific about what
17 duties you're referencing.
18 MS. CAIN: The duties that are...
19 ALJ RICHARD: I'm just asking you to rephrase the
20 question, being specific about the duties you're
21 referencing.
22 MS. CAIN: Okay.
23 BY MS. CAIN:
24 Q. The duties as a highway repairer, would you like me
25 to go through all duties? Dr. Berlin, are you aware of the
26 different types of duties that the Respondent performs as a
27 highway repairer?
28 A. Yes, I was given an list of tasks that he's
29 performed before the exam.
30 Q. Can you recall what those tasks are?
31 A. These task included shoveling cement, laying
32 asphalt, cutting out sidewalks, clean-up duties, working
33 with various power tools, requiring a driver's license,
34 shoveling snow, that's all I remember right now.
35 Q. Okay. And Dr. Berlin, does the Respondent's

1    reasonable accommodation prohibit him from performing those
2    duties that you just mentioned?
3         A.   It does not, except the use of a jackhammer.
4         MS. CAIN: Okay.   Thank you.
5    **CROSS EXAMINATION OF DR. BERLIN BY MR. BROWN:**
6         Q.   Good morning, Dr. Berlin.   So, you had the
7    opportunity to examine Mr. Hines, is that correct?
8         A.   Yes.
9         Q.   And you examined him in your office, correct?
10        A.   That is correct.
11        Q.   And during the course of your examination of
12   Mr. Hines, you came to learn that Mr. Hines had received
13   from his Agency a reasonable accommodation, correct?
14        A.   That is correct.
15        Q.   And in examining Mr. Hines, you reached the
16   conclusion that you predicted him to be -- I think the term
17   was normal, do you recall your testimony?
18        A.   Normal functional capacity for age.
19        Q.   Yeah.   And not withstanding the fact that you
20   reached this conclusion that he would have normal functional
21   capacity for age, you still reached the professional
22   conclusion that Mr. Hines should continue to receive a
23   reasonable accommodation, correct?
24        A.   Excuse me just a second.   Sorry.
25        Q.   Are you okay?
26        A.   No, no, I just...
27        Q.   Okay.   Not withstanding the fact that you had
28   reached the conclusion that you predicted Mr. Hines to have
29   a normal functional capacity, you still believed that he
30   should be entitled to reasonable accommodation, correct?
31   With regard to jackhammer?.
32        A.   I wasn't specifically to rule on whether he should
33   have that exclusion, and I did not address that issue.
34        Q.   But, I believe you testified, and correct me if I'm
35   wrong, that you believed in connection with your medical

**AW044**

1    examination of him that he should no longer -- he should

2    continue not to do the jack hammering.

3         A.    That was a pre-existing accommodation that I saw no

4    reason to tamper with.

5         Q.    Now, with regard to your conclusion regarding sort

6    of normal functional capacity, did -- just out of curiosity,

7    did you have Mr. Hines go on a treadmill?

8         A.    No.

9         Q.    Did you have Mr. Hines go on some kind of stair

10   master, any kind of machinery?

11        A.    No, machinery, but I would have had him do some

12   exercises in the exam room and monitor his response to that,

13   blood pressure and pulse.

14        Q.    Now, you say you would have.  As you think back to

15   October of 2006, did you, in fact have him do those

16   exercises?

17        A.    Yes.

18        Q.    How long was your examination of Mr. Hines?

19        A.    The exam -  12 minutes.

20        Q.    Yeah.  Yeah.  You asked him about his history with

21   the syncope?

22        A.    The exam part was 12 minutes, the history would

23   have been longer than that, but the actual physical exam

24   would have been 12 minutes.

25        Q.    I see.  I see.  And when you say the history part,

26   that involved you as well or someone on your staff?

27        A.    Involved me taking a history about, for instance,

28   his history of syncope.

29        Q.    Let's just talk briefly about syncope.  You're

30   familiar with that condition?

31        A.    Yes.

32        Q.    And is it correct to say that that's a condition

33   that can cause blackouts?

34        A.    In fact, it is blackouts.

35        Q.    Okay.  And is it a condition that -- that can be

BERLIN - CROSS                                              25

1    triggered, if that's the right word, by strenuous activity?

2        A.   There are certain diagnoses which would be -- which

3    would cause syncope with activity, yes.

4        Q.   Okay.   And in connection with your history of

5    Mr. Hines, did you come to learn that Mr. Hines had in fact

6    suffered blackouts in connection specifically with doing

7    certain pot-hole repair work in the job?

8        A.   No.

9        Q.   Is that because he did not tell you that or you

10   don't recall that?

11       A.   I don't recall when the syncope occurred.

12       Q.   But, did you come to learn, if you remember that

13   Mr. Hines had reported to you that some of his blackouts had

14   occurred on the job?

15       A.   Yes, I knew that at least one of them happened on

16   the job.   I was not aware of the specific task he was

17   performing.

18       Q.   If you know, would you consider pot-hole repair

19   work to be the kind of "activity" that could trigger a

20   syncope blackout?

21       A.   With confirmation of specific diagnosis, yes.

22       Q.   And would you agree that pushing a broom, a heavy

23   sweep broom on a highway pushing gravel is the kind of

24   activity that could trigger a syncope blackout?

25       A.   Only in the presence of specific diagnosis.

26       Q.   Now, with regard to specific diagnosis, are you

27   aware that Mr. Hines' own doctor had taken the position and

28   had made the diagnosis in fact, that Mr. Hines suffered from

29   syncope.

30       A.   That's not a diagnosis, it's a description, it's a

31   symptom.

32       Q.   Were you aware that Mr. Hines' own doctor had

33   described Mr. Hines as suffering from syncope?

34       A.   Yes.

35       Q.   I have no further questions.

**AW046**

PROCEEDINGS                                                    26

1       ALJ RICHARD: Any re-direct?

2       MS. CAIN: Yes, just one, Your Honor.  Dr. Berlin, given

3   that the Respondent has suffered from episodes of syncope,

4   would that preclude him from performing his duties as a

5   highway repairer?

6       DR. BERLIN: In the presence of specific diagnosis, it

7   might.

8       MS. CAIN: No further questions.

9       MR. BROWN: Nothing further, thank you.

10      ALJ RICHARD: I have a couple questions.  You mentioned

11  earlier that the reasonable accommodation did not preclude

12  the Respondent from performing certain task.  And that was

13  based on -- what knowledge did you have of what the

14  reasonable accommodation did?

15      DR. BERLIN: From the examinee.

16      ALJ RICHARD: From the Respondent, himself.

17      DR. BERLIN: Respondent.

18      ALJ RICHARD: Okay.  So, it was just his conversation...

19      DR. BERLIN: Hearsay.

20      ALJ RICHARD: And you mentioned -- in reference to the

21  second paragraph of your letter, where you say the employee

22  relates, this was due to a misunderstanding and he is

23  currently available to perform his job.

24      DR. BERLIN: Yes.

25      ALJ RICHARD: And when asked, you said you weren't aware

26  of the misunderstanding?

27      DR. BERLIN: The specific misunderstanding.

28      ALJ RICHARD: Okay.  So, that information in that one

29  sentence in your report where did you -- what's the basis

30  for that?

31      DR. BERLIN: We discussed his work and his refusal to do

32  certain task, and he advised me that there was a

33  misunderstanding and he would be available to do those

34  tasks.

35      ALJ RICHARD: Okay.  Okay.  But, you didn't talk in

**AW047**

PROCEEDINGS                                    27

1    detail about what the misunderstanding was?
2         DR. BERLIN: No, did not discuss specifically the
3    misunderstanding.
4         ALJ RICHARD: Okay.  I think I understand.  All right.
5    Thank you very much.
6         MS. CAIN: Thank you, Dr. Berlin.
7         MR. BROWN: Do you have any more witnesses?
8         MS. CAIN: No.
9         MR. BROWN.  Okay.
10        ALJ RICHARD: Any other witnesses, Ms. Cain?
11        MS. CAIN: No, we stipulated to not having the
12   supervisors testify.
13        ALJ RICHARD: Okay.  Okay.  Mr. Brown...
14        MR. BROWN: Yes, we're ready.
15        ALJ RICHARD: Well, let me, Ms. Cain, is the Petitioner
16   resting?
17        MS. CAIN: Yes.
18        ALJ RICHARD: Okay.  Mr. Brown.
19        MR. BROWN: We'd like to call as our only witness the
20   Respondent, Mr. James Hines.
21        ALJ RICHARD: Okay.  Good morning.
22        MR. HINES: Good morning.
23        ALJ RICHARD: Please raise your right hand.  Do you
24   swear or affirm the testimony you will give is the truth,
25   the whole truth and nothing but the truth?
26        MR. HINES: Yes, ma'am.
27        ALJ RICHARD: Thank you, please be seated.
28        MR. BROWN: You've got to get that left from the right?
29        MR. HINES: Yeah.  I'm kind of nervous.
30        ALJ RICHARD: Okay.  Please -- that's okay, please state
31   your name for the record.

**AW048**

32        MR. HINES: Mr. James Hines.
33        ALJ RICHARD: Okay.  Thank you.  Mr. Brown.
34        MR. BROWN: Thank you, Your Honor.
35        **Whereupon, J A M E S   H I N E S, a witness herein,**

**EXHIBIT E**

Russell Holcomb                                          12/18/2002
Deputy Chief Engineer
NYC Department of Transportation
Bridge Maintenance, Inspection and Operations

This letter has been written on behalf of:

|  |  |
|---|---|
| Charles Remi | Deputy Director – Bridge PM |
| Anthony Napolitano | Chief – Bridge PM |
| James Campbell | Deputy Chief – Bridge PM |
| Michael Cummiskey | A/ District Supervisor – Bridge PM |

We would like to bring your attention to an existing situation at the Pulaski Facility.
We have an employee named James Hines (Highway Repairer) assigned to Pulaski
Facility, which in the past two years has made several threatening comments to us
individually and collectively. Although we have documented these various incidents, it
appears that nothing substantial has occurred in terms of disciplinary action. These
incidents stem from the refusal to execute direct orders to abusive and vulgar language
towards supervision and the threat to life and limb.

These incidents, occurring over a period of time, have progressively gotten worse. The
derogatory language has continued throughout and, on some occasions, not documented
until this individual has become irrational or he has created a scene for many to witness.
The physical threats have surfaced within the past six months or so.

Although even abusive language towards a supervisor should not be tolerated, we in the
field have come to realize that, for the most part, our subordinates sometimes need to
"vent". They state what is on their mind, release some of their frustrations and move on.
Unfortunately this does not seem to be the case with Mr. Hines.

We are afraid that the lack of immediate attention to Mr. Hines' conduct is sending a
clear picture to him and possibly to others that behavior like this can and will be tolerated
by the NYC DOT and it's supervisors.

We hereby appeal to your office to look into what we consider to be a serious matter. We
would like to thank you in advance for any assistance you can provide. We would also
like to ask you to refer this document to Commissioner Henry Perahia.

Sincerely,

Charles Remi                                    Anthony Napolitano

James Campbell                                  Michael Cummiskey

cc:    Exec Dir – D. Mando  D.M.
                                12/18/02


PLAINTIFF'S
EXHIBIT
J
LCS 3 2 06

**New York City
Department of Transportation**

Iris Weinshall, Commissioner

*Cadley file*

# M E M O R A N D U M

**To:** Dunel Cadley
Highway Repairer – Bridge PM

**From:** Michael Cummiskey
A/District Supervisor – Bridge PM

**Subject:** Insubordination

**Date:** March 14, 2003

---

On March 12, 2003 you asked to speak to me regarding the conversation from the previous day. I told you that I was not ready to speak to you now; we will have a conversation later in the afternoon. At that point you stated to me "This conversation better not be about my evaluation. If it is, I know what I got already. Straker gave me a copy of my evaluation. If you change it, I'll sue you. I know that you changed last year's evaluation. It's not going to happen again. I'll sue you." As I instructed you to join your crew you repeated your comments boisterously.

I attempted to speak to you concerning this incident on Friday, March 14, 2003 but you refused to listen. You stated that I could not speak to you without your union representative present. I told you that a union representative was not required for this conversation. You stated that I could not speak to you without one present. As you left the office, you made a comment about bringing me up on charges.

I am presenting this memo to you as notification that your actions and manner in which you are speaking to me are insubordinate. If this behavior should continue I will have no choice but to refer you for disciplinary charges.

| | |
|---|---|
| _____ | _____ |
| Dunel Cadley | Michael Cummiskey |
| _____ | [✓] Refused to sign   3/25/03 |
| Witness | Date |

cc: *Exec Dir. D. Mando; C. Remi; T. Napolitano; J. Campbell; S. Garcia Q. Williams; File*

Visit DOT's Website at www.nyc.gov/calldot
*Got a transportation problem/question/complaint?* Dial 212 or 718
TTY Deaf or Hearing-Impaired, Dial 212/442-9488

CALLDOT
*225-5368

**Mando, Dan**

| | |
|---|---|
| **From:** | Garcia, Susan |
| **Sent:** | Thursday, April 03, 2003 11:33 AM |
| **To:** | Mando, Dan |
| **Cc:** | Roses, Dorothy; Napolitano, Anthony; Remi, Charles; Bombace, Roger; Holcomb, Russell |
| **Subject:** | James Hines Incident -- April 2, 2003 |
| **Importance:** | High |

Dan:

I spoke with Tony Napolitano today for an update on the April 2, 2003 incident regarding Highway Repairer James Hines.
Mr. Napolitano indicated that the employee has returned back to the Pulaski Yard after reporting to the Office of the Advocate. He added that Mr. Hines apparently told the Office of the Advocate that the witnesses who had made written statements were lying.

I urge you to seek some type of action on the part of the Agency. It is disturbing that although we have provided written documentation of numerous behavioral incidents regarding this individual, two of which involve threats alluding to a gun, no apparent action has been made to remove the employee from the work place. It is not right that there has been no attempt to protect field supervision and employees who have to work daily, face-to-face, with an openly hostile individual. At what point is the security of our field staff going to take precedence?

sg

 **New York City**
**Department of Transportation**

Bridge Preventive Maintenance
Rector Street – 4ᵗʰ Floor
New York, New York 10006
Tel: 212/788-1710
Fax: 212/788-8985

Iris Weinshall, Commissioner

### M E M O R A N D U M

**To:**        James Hines
               Assistant Highway Repairer - Bridge PM

**From:**      Michael Cummiskey
               A/District Supervisor - Bridge PM

**Subject:**   Code of Conduct Violation
               Written warning

**Date:**      November 20, 2000

---

On November 17, 2000, in a discussion with you regarding an early departure from work, you made the following derogatory comment to me, "Who the F*** do you think you are?" Your comment was in violation of the NYC DOT Code of Conduct #3, which states, "...Speak to or act discourteously, or use boisterous, abusive or vulgar language, in any relationship with the public or with other DOT personnel, while on duty."

This memo will serve as a written warning. Any further violations will result in Advocate notification and possible disciplinary charges.

_____              _____
James Hines                          Michael Cummiskey

                                     11/22/2000
_____              _____
Witness                              Date

Refusal to sign   ☐

Visit DOT's Website at www.nyc.gov/calldot **CALL DOT**
Got a transportation problem/question/complaint? Dial 212 or 718
TTY Deaf or Hearing-Impaired: Dial 212/442-9488      *225-5368

 EXHIBIT D

HDA0063

**Date:**   5/10/2002 2:02 PM
**Sender:** Charles Remi
**To:**     Erica Caraway; Dan Mando
**cc:**     Susan Garcia; Quinella Williams
**Priority:** Normal
        Receipt requested
**Subject:** Vehicle Accident, concerning Highway Repairer James Heins

    Erica, as discussed.

        On Wednesday, 5-8-02 at approximately 2:00PM, one of
our Bridge
    Preventive Maintenance Debris Crews working out of the
Pulaski Yard
    Facility in BKLYN, were finished cleaning the Flushing Ave
overpass &
    underpass in Queens. The crew consisted of 4 (four)
employees, Acting
    Supervisor Highway Repairer, Abibi Ocampo, Highway
Repairers, James
    Heins & Steven Borowik and Assistant Highway Repairer
Roosevelt Gee.
    Both Abibi Ocampo & Steven Borowik told me the same story.
Abibi &
    Roosevelt were in 195D on the left side of the roadway and
Steven was
    in 89BU on the right side of the roadway pulled up ahead
waiting for
    James who was driving 83BU. James lost control and hit
89BU in the
    rear end causing 89BU to hit a parked vehicle. Both
vehicles were
    undriveable and had to be Towed by Flatland Yards Fleet
Services to
    the repair shop. The roadway was dry with no obstacles and
wide enough
    not to loose control. This was also confirmed by the
mechanic who was
    sent to the location. It was also mentioned that James
said to the EMS
    the breaks failed. I called Fleet Services to have them
check the
    breaks and they confirmed the breaks were and still are in
good!
    working order.

    Charlie

3



HDA0068



**New York City**
**Department of Transportation**

Bridge Preventive Maintenance
Rector Street – 4ᵗʰ Floor
New York, New York 10006
Tel: 212/788-1710
Fax: 212/788-8985

Iris Weinshall, Commissioner

## M E M O R A N D U M

**To:**       Quinnella Williams

**From:**     Michael Cummiskey
              A/District Supervisor - Bridge PM

**Subject:**  James Hines
              Highway Repairer - Bridge PM

**Date:**     November 7, 2001

On Thursday, November 1, 2001 a situation was brought to my attention. The situation deals with James Hines and comments made by him to an Acting Supervisor. The supervisor has written down a summary of the incident, which is an attachment to this memo.

My concern is that this is not the first time that Mr. Hines has made comments of a threatening nature or made threatening gestures. I would appreciate any assistance or advice you may have concerning this matter.

Attachment

cc:    ExecDir. D. Mando; C. Remi; A. Napolitano; J. Campbell; S.Garcia




Visit DOT's Website at www.nyc.gov/calldot
Got a transportation problem/question/complaint? Dial 212 or 718
TTY Deaf or Hearing-Impaired, Dial 212/442-9488                *225-5368



HDA0059



**New York City**
**Department of Transportation**

Iris Weinshall, Commissioner

**Division of Bridges**
2 Rector Street - 8th Floor
New York, New York 10006
Tel 212/788-2100 Fox: 212/788-9015

# MEMORANDUM

**TO:**      Erica Caraway

**FROM:**    Dorothy Roses

**RE:**      James Hines

**DATE:**    October 31, 2002

Attached, please find back up documentation relating to the history of the abusive behavior on the part of James Hines. Dan Mando, Executive Director for Bridges' Maintenance and Repair Units, has requested that I forward this case to your office for disciplinary action. Additionally, D/C Perahia has indicated to me that he does not want cases such as this to be dealt with via Field Level Discipline.

As you will see, Mr. Hines has refused to sign written reprimands on three separate occasions, September 18, 2001, August 30, 2001 and November 20, 2000. Since the November 20, 2000 occurrence took place more than 18 months ago, we understand that there is nothing we can do regarding that incident, but it adds to the pattern of abusive behavior. This case was referred to the previous Advocate in November 2001. We were assured by Lorna Hamblin that Keith Howard would be handling the case. No action was taken. Regardless of the 2001 performance evaluation, we need something to be done about this employee. The latest incident, August 23, 2002, shows that his abusive behavior continues.

Once you review the attached information, I would like to meet with you to discuss our course of action. Thank you for your cooperation in this matter.

CC: C/B/O Perahia, D/C/E Holcomb, E/D Mando

Visit DOT's Website at www.nyc.gov/calldot **CALL**
Got a transportation problem/question/complaint? Dial 212 or 718
TTY Deaf or Hearing-Impaired, Dial 212/442-9488    •225-5268



HDA0053

11-22-02:16:15   :CBO                                          :212788901S        #  1/  2

Bridge Preventive Maintenance
2 Rector Street – 4th Floor
New York, New York 10006
Tel: 212/788-1710
Fax: 212/788-8985

**New York City**
**Department of Transportation**

Iris Weinshall, Commissioner

| Post-It® Fax Note | 7671 | Date 11-22 | ↓ of ↑ pages ▶ 2 |
|---|---|---|---|
| To Erica | | From Dorothy | |
| Co./Dept. Advocate | | Co. Bridges! | |
| Phone # 6-0130 | | Phone # 8-9705 | |
| Fax # 6-0165 | | Fax # 8-9015 | |

**M E M O**

**To:**     Charles Remi
            Director – Bridge PM

**From:**   Michael Cummiskey
            A/District Supervisor – Bridge PM

**Subject:** James Hines
            Highway Repairer – Bridge PM

**Date:**    November 22, 2002

At 7:35am I gave Highway Repairer James Hines an assignment to work on
the Brooklyn Bridge with Highway Repairer Lou Dumeng.
At 7:55am, HR James Hines asked why only two people were assigned to
the Brooklyn Bridge when more people are available. HR James Hines was
referring to Highway Repairer L. Buccofla who was assigned to the yard for
the day. When I stated this to HR James Hines he said it was discrimination.
I told him that it was not discrimination, this is the assignment given for the
day. HR James Hines then replied, "It is discrimination and you can't tell me
how to think."

At 8:05am I noticed that HR Lou Dumeng was loading the truck by himself. I
approached HR James Hines and instructed him to give HR L. Dumeng a
hand. HR James Hines then stated " I gotta get out of here before I kill
someone. I need to go to the doctor. I need to go to a Psychiatrist. I'm gonna
kill somebody."

Shortly after this, James Hines entered the District Supervisor's office, where
you (C. Remi), James Campbell and myself were present, and said " I have
to go to the doctor before I hurt something."

cc:     Exec Dir.- D. Mando; A. Napolitano; J. Campbell; S. Garcia

Visit DOT's Website at www.nyc.gov/calldot
Got a transportation problem/question/complaint? Dial 212 or 718    CALL DOT
TTY Deaf or Hearing-impaired, Dial 212/442-9488        *226-5368



PLAINTIFF'S
DOT EXHIBIT DOT
B
LCS 3/2/06     HDA0024

 **New York City**
**Department of Transportation**

2 ...lor Street – 4ᵗʰ Floor
New York, New York 10006
Tel: 212/788-1710
Fax: 212/788-8985

Iris Weinshall, Commissioner

## M E M O R A N D U M

**To:**       Dan Mando
              Executive Director – Bridge PM & Repair

**From:**     Anthony Napolitano
              Chief – Bridge PM

**Subject:**  Highway Repairer – James Hines

**Date:**     April 2, 2003

On Tuesday – April 2, 2003, two Highway Repairers working in the Pulaski Yard facility came into my office explaining to me that they just had an altercation with Mr. James Hines. The two Highway Repairers – Douglas Hannon & Salvatore Gioia, explained to me that Mr. Hines started verbally abusing them for no reason at all. Douglas Hannon stated that Mr. Hines said to him a number of times "you don't know whether your white or black". Salvatore Gioia, who was trying to break the two apart, stated that Mr. Hines said to him "stay out of this white boy". He also said Mr. Hines made comments about "fucking Italians suck". To top it off, Mr. Hines made reference to what others believe was a gun and that he's "got one and is ready to die if he has to".

I immediately paged the Advocates Office and was told to send Mr. Hines down to 253 Broadway right away.

Attached are statements from Highway Repairer's Douglas Hannon & Salvatore Gioia.

*cc: C. Remi; J. Campbell; S. Garcia; Q. Williams; file - employee*

Visit DOT's Website at www.nyc.gov/cal dot
*Got a transportation problem/question/complaint? Dial 212 or 718*
TTY Deaf or Hearing-Impaired: Dial 212/442-9488





HDA0002